## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **SYLVIA DIFFENDERFER, et al** | **CIVIL CASE NO.: 08-1918 (JAF)** |
| Plaintiffs | |
| **V.S.** | |
| **RAMÓN E. GÓMEZ-COLÓN, et al** | **VOTING RIGHTS** |
| Defendants | |

## MOTION TO DISMISS

**TO THE HONORABLE COURT:**

**COMES NOW** co-defendant Gerardo A. Cruz-Maldonado, through the undersigned counsel and very respectfully **SETS FORTH** and **PRAYS:**

### I.    INTRODUCTION

As this Honorable Court may assert through judicial knowledge, a General Election is scheduled to take place on November 4, 2008, for all elective offices in the Commonwealth of Puerto Rico.  As with every election, the upcoming event is not without legal controversy.

On July 31, 2008, the Puerto Rico Electoral Commission (hereinafter referred to as "the Commission") entered a Resolution, through its President, co-defendant Ramón E. Gómez in the Matter of Changes to the Electoral Ballot, Case No. CEE-RS-08-48 before said institution, whereby it denied a request made by the Alternate Electoral Commissioner of the New Progressive Party (hereinafter referred to as "NPP") for the printing of bilingual (English/Spanish) ballots for the upcoming election.  The President adopted the arguments set forth in the Commissions June 25, 2004 Resolution discussing the exact same issue, in Case No. CEE-RS-04-43.   The NPP did not exercise its statutory right to appeal the July 31st Resolution to the Puerto Rico Court of First Instance and beyond.

Immediately upon the Commission's decision, co-defendant Edwin Mundo-Ríos, Electoral Commissioner for the NPP (loudly, publicly and consistently) announced that he would seek relief before this Honorable Court.  While Mr. Mundo did nothing other than allowing the statutory (10-day) appeal deadline run its course, on August 19, 2008 (a mere three weeks before the September 10, 2008, ballot printing deadline), two citizens -plaintiffs

herein- filed a purported class action[1], against all relevant components of the Commission, alleging that the absence of bilingual ballots impinges upon their rights under several constitutional provisions. Plaintiffs seek declaratory and injunctive relief under the Civil Rights Act of 1871, 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq. in the form of court-ordered bilingual ballots.

It should be stressed that nowhere in the Verified Complaint do the two plaintiffs allege that they have sought guidance from the Commission (in their native tongue) or that they have been denied such guidance. Indeed, the Commission's position is that they are willing to offer such guidance to any English-speaking voter who requests and also to disseminate instructive guidelines in the Island's written and radio, English-speaking media. This disposition in the Commission's part undoubtedly takes care of plaintiffs' stated concerns and should moot out the instant matter. However, if plaintiffs insist on seeking an order for **over two million ballots** to be printed in bilingual format, with the corresponding expenditure in public monies, it would be clear that the instant motion is more about making a political statement than about resolving a genuine problem.

An Order to Show Cause was entered on August 20, 2008, setting an August 26 (at 4:00 p.m.) deadline for the filing of briefs and an August 27, 2008 Show Cause Hearing. **We respectfully request that the instant motion be deemed as the appearing party's brief as per the Show Cause Order.**

For the foregoing reasons, the instant action must be dismissed *in toto*.

## II.    APPLICABLE PROCEDURAL STANDARD

The instant motion raises defenses that seek dismissal for lack of subject matter jurisdiction, governed by F.R.C.P. 12(b)(1) and for failure to state a claim, governed by F.R.C.P. 12(b)(6). We briefly canvass the applicable procedural landscape.

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court should dismiss a claim when the factual pleadings set forth in the complaint, if credited would not entitle the claimant to the relief sought. When assessing a Rule 12(b)(6) motion, the Court accepts all well-pleaded factual allegations as true, and draws all reasonable inferences in plaintiff's favor.

---

[1] The issue of whether or not the instant case should be certified as a class action will be discussed by the appearing party in a separate motion.

See Correa-Martínez v. Arrillaga-Beléndez, 903 F.2d 49, 51 (1st Cir. 1990); Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988).  The Court need not credit, however, "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like" when evaluating the Complaint's allegations.  Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).  When opposing a Rule 12(b)(6) motion, "a plaintiff cannot expect a trial court to do his homework for him."  McCoy v. Massachusetts Institute of Tech., 950 F.2d 13, 22 (1st Cir. 1991).  Plaintiffs are responsible for putting their best foot forward in an effort to present a legal theory that will support their claim. Id at 23 (citing Correa Martínez, 903 F.2d at 52).  Moreover, plaintiffs must set forth "factual allegations, either direct or inferential, regarding **each** material element necessary to sustain recovery under some actionable theory." Gooley, 851 F.2d at 514 (emphasis added).  By the same token, "subjective characterizations or conclusory descriptions of a general scenario which could be dominated by unpleaded facts will not defeat a motion to dismiss".  Coyne v. City of Somerville, 972 F.2d 440, 444 (1st Cir. 1992).  Accordingly, "[w]hen a complaint omits facts that, if they existed, clearly would dominate the case, **it is fair to assume that those facts do not exist**." O'Brien v. DiGrazia, 544 F.2d 543 (1st Cir.1976) (emphasis added).  Despite this generous standard, the First Circuit steadfastly held that "[r]ule 12(b)(6) is not entirely a **toothless tiger**.... The threshold for stating a claim may be **low**, but it is **real**."  Dartmouth Rev. v. Dartmouth College, 889 F.2d 13, 16 (1st Cir.1989) (emphasis added).

It is well-settled that when ruling on a motion to dismiss, the Court is **limited** to the pleadings set forth in the complaint.  Aldahonda v. Parke Davis & Co., 882 F.2d 590, 592 (1st Cir. 1989).  As a matter of fact, matters outside the scope of the pleadings should be downright **ignored**.  Maldonado v. Domínguez, 137 F.3d 1, 6 (1st Cir. 1998).  Specifically, the focus should be "whether a liberal reading of [the complaint] can reasonably admit of a claim ...." Litton Indus., Inc. v. Colón, 587 F.2d 70, 74 (1st Cir. 1978); see also Doyle v. Hasbro, Inc., 103 F.3d 186, 190 (1st Cir. 1996).  In judging the sufficiency of a complaint, the District Court is bound to "differentiate between well-pleaded facts, on the one hand, and 'bald assertions, unsupportable conclusions, periphrastic circumlocution, and the like,' on the other hand; the former must be credited, but the latter can safely be ignored. " LaChapelle v. Berkshire Life Ins.

3

Co., 142 F.3d 507, 508 (1st Cir. 1998) (quoting Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996)). See also Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999).

It used to be that Courts would invoke the Supreme Court's decision in Conley v. Gibson, 355 U.S. 41, 45-46 (1957) to the effect that "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." The traditional reading of Conely made for a very liberal pleading standard and allowed many poorly pled allegations to proceed beyond the Rule 12(b)(6) stage. Very recently, the Supreme Court announced that this conservative reading of their 1957 decision was in error and explained that:

> We could go on, but there is no need to pile up further citations to show that Conley's "no set of facts" language has been questioned, criticized, and explained away long enough. To be fair to the Conley Court, the passage should be understood in light of the opinion's preceding summary of the complaint's concrete allegations, which the Court quite reasonably understood as amply stating a claim for relief. But the passage so often quoted fails to mention this understanding on the part of the Court, and after puzzling the profession for 50 years, **this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.** See Sanjuan, 40 F.3d at 251 (once a claim for relief has been stated, a plaintiff "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint"); accord, Swierkiewicz, 534 U.S., at 514, 122 S. Ct. 992, 152 L. Ed. 2d 1; National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 256, 114 S. Ct. 798, 127 L. Ed. 2d 99 (1994); H. J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 249-250, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989); Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984). Conley, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival.

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1969 (2007) (emphasis added)

The First Circuit has embraced the Twombly clarification and has found it to stand for the proposition that "[i]n Twombly, the Court stated that 'a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' " Damon v. Moore, 520 F.3d 98, 102-103 (1st Cir. 2008) (Delgado-Colón, J., sitting by designation) (Citing Twombly, 127 S.Ct. at 1964-1965); see also Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 84 (1st Cir. 2008); Dixon v. Shamrock Fin. Corp., 522 F.3d 76, 79 (1st Cir. 2008); Miss. Pub. Emples. Ret. Sys. v. Boston Sci. Corp., 523 F.3d 75, 85 (1st Cir. 2008).

4

Similarly, Rule 12(b)(1) of the Federal Rules of Civil Procedure allows any party against whom a claim is asserted to seek dismissal on the basis of the Court's lack of subject matter jurisdiction. Valentín v. Hosp. Bella Vista, 254 F.3d 358, 362 (1st Cir. 2001). It is incumbent of the federal courts, as the limited jurisdiction that they are, "to police the border of federal jurisdiction". Spielman v. Genzyme Corp., 251 F3d 1 (1st Cir. 2001). Thus, motions filed under this rule **must be given precedence** by the district courts. Northeast Erectors Ass'n of the BTEA v. Secretary of Labor, 62 F.3d 37, 39 (1st Cir. 1995). Where, as here, jurisdiction is challenged, the party invoking the Court's jurisdiction (i.e., the plaintiff) **bears the burden** of establishing the existence thereof. Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995), cert denied at 515 U.S. 1144.

In considering a motion to dismiss under F.R.C.P. 12(b)(1), the Court assumes that all material allegations set forth in the plaintiff's complaint are true. Williams v. City of Boston, 784 F.2d 430, 433 (1st Cir. 1986). Nonetheless, contrary to the case of a F.R.C.P. 12(b)(6) motion, under rule 12(b)(1), the Court is not confined to the scope of the pleadings and "may consider whatever evidence has been submitted, such as depositions and exhibits submitted in this case." Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996). Hence, "[t]he court, without conversion, **may consider extrinsic materials and, to the extent it engages in jurisdictional factfinding, is free to test the truthfulness of the plaintiff's allegations**." Dynamic Image Techs., Inc. v. United States, 221 F.3d 34, 37 (1st Cir. 2000) (emphasis added).

Having rehearsed the applicable procedural standard and for the sole purpose of the instant motion, plaintiffs' **factual** pleadings are deemed admitted.

## III.   DISCUSSION

### A) PLAINTIFFS' CLAIMS ARE TIME BARRED

In the instant matter, this Honorable Court need not delve into the merits of plaintiffs' claims, inasmuch the pleadings set forth in said parties' verified complaint are time barred.

Since the enactment of § 1983 in 1871, in the aftermath of the Civil War and the Emancipation Decree, said statute has lacked a particular statute of limitations. In light of this void left by Congress, the Supreme Court has directed the federal courts to adopt the relevant provisions from the analogous statute of limitations of the state in which the District Court is

sitting.  Wilson v. García, 471 U.S. 261, 266-280 (1985).  The Supreme Court's mandate has for the lower courts to adopt the forum state's statute of limitations for personal injury cases, as it seems to be the most analogous to the type of litigation presenting a § 1983 action.  Owens v. Okure, 488 U.S. 235, 236 (1989).

For § 1983 actions originated in Puerto Rico, the applicable limitation period for tort actions is one year under Article 1868(2) of the Puerto Rico Civil Code.  31 PR Laws Ann. § 5298(2).  Carreras-Rosa v. Alves-Cruz, 127 F.3d 172, 174 (1st Cir. 1997); Muñiz-Cabrero v. Ruiz, 23 F.3d 607, 610 (1st Cir. 1997); Torres v. Superintendent of Police, 893 F.2d 404, 406 (1st Cir. 1990).  One year has consistently been construed as meaning **365 days** or **366 days** in leap year.  Olivo Ayala v. López Feliciano, 729 F. Supp. 9, 10 (D.P.R. 1990); Yeinsip v. Lufthansa German Airlines, 725 F. Supp. 113, 115 (D.P.R. 1989).

It is thus, beyond peradventure that the instant action is subject to a one-year prescriptive period.  The existence of an underlying claim under the Declaratory Judgment Act does not preclude a limitations period finding.  The Declaratory Judgment Act is not a source of substantive right but rather "creates a particular remedy where a federal district court already has jurisdiction to entertain a suit."  Commercial Union Ins. Co. v. Walbrook Ins. Co., 41 F.3d 764, 772 (1st Cir. 1994).  Hence, the statute does expand the Court's jurisdiction.  Nashoba Communications v. Town of Danvers, 893 F.2d 435, 437 (1st Cir. 1990).  In the case of Gilbert v. Cambridge, 932 F.2d 51 (1st Cir. 1991), a group of citizens challenged the constitutionality of a municipal ordinance, past the applicable limitations period and alleged that they were still entitled to declaratory relief, inasmuch they were "still under the lash of the Ordinance, it makes no sense to deny them declaratory relief since, in any future enforcement action, they would promptly raise the constitutionality of the Ordinance as a defense."  Id. at 58.  The Court rejected this argument, holding that:

> **We refuse to subvert the realties of the case before us simply to suit a party's convenience.** The Southview plaintiffs are, indeed, plaintiffs. They have been barred from bringing a claim for damages since three years after the denial of their permit applications. **Draping their claim in the raiment of the Declaratory Judgment Act, some five years after the window of opportunity framed by the statute of limitations has closed, cannot elude this time bar.**

Id. (emphasis added)

In order to assess a challenge on statute of limitations grounds, the Court must first

determine the point in time in which plaintiff first had notice (or had reason to have such notice) of the allegedly wrongful action. Guzmán-Rivera v. Rivera-Cruz, 29 F.3d 3, 5 (1st Cir. 1994). This point in time is commonly referred to as the date of accrual. It is black letter law that, as far as § 1983 actions is concerned, "[a]lthough the limitations period is determined by state law, the date of accrual is a federal law question." Carreras-Rosa, 127 F.3d at 174 (1st Cir. 1997). The one-year statute of limitations applicable to the instant action "begins running one day after the date of accrual, which is **the date plaintiff knew or had reason to know of the injury**." Benítez-Pons v. Commonwealth of Puerto Rico, 136 F.3d 54, 59 (1st Cir. 1998) (emphasis added).

We must therefore begin by asking the obvious question of: what is the injury that the plaintiffs allege? The answer is at paragraph 1.1 of the Verified Complaint, which, with regards to this action:

> It is grounded on defendants' final determination to provide electoral ballots-and the instructions printed therein-solely in the Spanish language, thus, excluding (disfranchising) and unequally treating a class of qualified voters who do not read or understand the Spanish language. Said actions not only violates (sic) and or restricts (sic) said group of qualified voters' right to vote freely but, furthermore, risks and endangers their right to have their votes invalidated, because-contrary to the general population-they would not be able to follow the instructions on the ballot.

In other words, plaintiffs allege that all of the violations imputed in the complaint stem from the same common evil, to wit: the Spanish-only ballots and instructions. Indeed, plaintiffs refer to the ballot language issue as an "Unconstitutional Policy". See Verified Complaint at ¶ 5.1-5.9. We must therefore assess when was it that plaintiffs first learned of this policy, which would be our date of accrual and the triggering event for the applicable one-year limitations period to begin running.

Co-plaintiff Sylvia Diffenderfer avers that she has been a Puerto Rico resident for **14 years** and that she has been supposedly felt "intimidated" by the Spanish language ballots/instructions and that **for that reason she has never voted in past elections**. See Verified Complaint at ¶ 3.1. Ms. Diffenderfer's **admission** that she has not voted in **past** elections because of the **same** policy that she now challenges, implicates that her claims accrued at least during the last elections, i.e., **four years ago**. Her claims have arrived at least 3 years too late.

The case of co-plaintiff Robert McCarroll is even more dramatic, as he **admits** that he **attempted to cast his vote in the 2004 General Election** and had problems with the Spanish language ballots/instructions. See Verified Complaint at ¶ 3.2. There is no doubt that if Mr. McCarroll did not know about the Spanish language ballots/instructions before November 2, 2004 (the last election date) he learned about it right there on the polling station where he went to exercise his suffrage. His claims also accrued, at least in 2004, and are therefore also time barred.

Given the admissions set forth on paragraphs 3.1 and 3.2 of the Verified Complaint, plaintiffs cannot say that their claims should accrue from the July 31, 2008 Resolution, as said decision did not change the status quo but rather rejected a request for a modification of the long-standing rule that plaintiffs knew of since at least 2004.

Plaintiffs cannot find refuge in the so-called continued violation doctrine either. The date of accrual has steadfastly been fixed on the first discrete act of discrimination identified by the plaintiff (here the use of Spanish-only ballots/instructions), **regardless of the recurrence of future such acts**. A recent First Circuit decision reinforces this point. See Marrero-Gutierrez v. Molina, 491 F.3d 1, 5-6 (1st Cir. 2007). The Marrero-Gutierrez Court adhered to the rule that "[a] claimant is deemed to 'know' or 'learn' of a discriminatory act at the time of the act itself and not at the point that the harmful consequences are felt." Id. This holds true, regardless of whether or not plaintiff learned of the discriminatory animus at a later time. Id.; citing Morris v. Gov't Dev. Bank of P.R., 27 F.3d 746, 749-750 (1st Cir.1994).

The above standard was reaffirmed through a recently issued opinion whereby the First Circuit of Appeal affirmed the dismissal of a §1983 claim of political harassment that was raised almost four years after the initial injury. See Pérez-Sánchez v. Public Bldg. Auth., 531 F.3d 104 (1st Cir. 2008). Moreover, in said opinion, rendered by Sandra Day O'Connor, Retired Associate Justice of the U.S. Supreme Court (sitting by designation), the First Circuit expressly stated that the continuing violation doctrine was inapposite for the late-filing plaintiff:

> Appellant nonetheless argues that the statute of limitations should be evaluated under the continuing violation doctrine. **Under this doctrine, a plaintiff can recover for injuries that occurred outside the statute of limitations under certain narrow conditions. Although the name of the doctrine may sound auspicious for late-filing plaintiffs, it does**

> *not* **allow a plaintiff to avoid filing suit so long as some person continues to violate his rights**. "The 'continuing violation' doctrine is misnamed. . . . The office of the misnamed doctrine is to allow suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought." <u>Morales-Tanon</u>, 524 F. 3d at 18-19 (quoting <u>Limestone Dev. Corp. v. Village of Lemont</u>, 520 F. 3d 797, 801 (7th Cir. 2008)).
> As the district court recognized, the events surrounding appellant's alleged demotion all took place in 2001. While plaintiff points to numerous additional grievances that took place in later years, the district court correctly noted that all of those were either effects of that initial wrongful conduct, or isolated incidents that did not amount to separate and actionable violations under §1983

<u>Id</u> at 107 (emphasis added)

Simply put, plaintiffs had one year from the date in which they first learned of the Spanish language ballots/instructions to seek redress for said injuries. They have failed to act within this period and now must face the consequences of their lassitude.

**B) EQUAL PROTECTION**

Plaintiffs' first line of attack is based on the Equal Protection Clause of the Fourteenth Amendment. The Fourteenth Amendment guarantees to all citizens equal protection of the laws. Puerto Rico is subject to the equal protection clause. <u>Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico</u>, 478 U.S. 328, 331 (1986). In order to prevail on an equal protection claim the plaintiff must establish that the challenged action or regulation is driven by "an element of purposeful or intentional discrimination". <u>Snowden v. Hughes</u>, 321 U.S. 1, 6 (1944). The equal protection clause is geared towards eliminating class-based classifications created by those who wield public power. <u>See</u> <u>Plyler v. Doe</u>, 457 U.S. 202, 213 (1982) ("The Equal Protection Clause was intended to work nothing less than the abolition of all caste-based and invidious class-based legislation."). In sum, the equal protection clause guarantees that "all persons similarly circumstanced shall be treated alike." <u>F. S. Royster Guano Co. v. Virginia</u>, 253 U.S. 412, 415 (1920). However, "[t]he Constitution **does not require** things which are **different** in fact or opinion to be treated in law as though they were the same." <u>Tigner v. Texas</u>, 310 U.S. 141, 147 (1940) (emphasis added).

In order to prevail in a § 1983 equal protection claim, a plaintiff must allege and prove a differential treatment of a class of persons to which he/she belongs. <u>Alexis v. McDonald's Restaurants of Massachusetts, Inc.</u>, 67 F.3d 341, 354 (1st Cir. 1995).

Equal protection claims are subject to different standards of scrutiny, depending on the basis for the challenged classification. Plaintiffs herein allege that they belong to a class of

English speaking citizens, eligible to vote in the Puerto Rico General Elections.  Hence, the basis for the alleged classification is **language**.  In <u>Smothers v. Benitez</u>, 806 F. Supp. 299 (D.P.R. 1992) (Fusté, J.), this Honorable Court recognized that "[t]he difficulty in treating plaintiff's equal protection claim lies in the fact that language use by minority language groups has not yet been situated within the framework of legal standards which control the application of the equal protection clause of the fourteenth amendment."  <u>Id</u>. at 305.  The Court did however, hold strict scrutiny to apply in cases where language is seen as an ethnic trait, used to discriminate **on the basis of national origin**.  <u>Id</u>. at 306.  This however, is something that is not pled in the instant case, as the Verified Complaint is unambiguously directed towards protecting English-speaking voters, without regards of whether they speak this language because they are natives of the United States, the United Kingdom, Australia, etc.

The issue of which level of scrutiny applies to classifications based solely on language (without regard to national origin), left unanswered in <u>Smothers</u>, was resolved by the Third Circuit, which squarely held that **"all classifications based on the ability to speak or understand a foreign language are subject to the same level of equal protection scrutiny, namely, rational-basis review."** <u>Pemberthy v. Beyer</u>, 19 F.3d 857, 871 n. 19 (3d Cir. 1994) (emphasis added); <u>see also</u> <u>Moua v. City of Chico</u>, 324 F. Supp. 2d 1132, 1137-1138 (E.D. Cal. 2004).  Inasmuch the classification based solely on language does not fall within those that trigger strict scrutiny (such as race) or intermediate scrutiny (such as gender) and in accordance with the above-cited authority, we must apply rational-basis scrutiny.

It is axiomatic that under rational-basis scrutiny, the challenged government action at issue **is presumed to be constitutionally valid**.  <u>McDonald v. Board of Election Comm'rs of Chicago</u>, 394 U.S. 802, 808-809 (1969).  It is therefore up to the plaintiffs to controvert this presumption and all that the government must do in such cases is to point to a reasonably logical basis in order to pass the Equal Protection test.  In other words, the applicability of rational-basis scrutiny "means that the appellants [plaintiffs] **bear the burden of demonstrating that there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals."** <u>Eulitt v. Me. Dep't of Educ.</u>, 386 F.3d 344, 356 (1st Cir.

2004) (emphasis added).  Therefore, "[a] classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality".  Dandridge v. Williams, 397 U.S. 471, 485 (1970) (internal citation omitted).  Moreover, the Court is not allowed to second-guess the Legislature's choices, as rational basis scrutiny "is not a license for courts to judge the wisdom, fairness or logic of legislative choices." FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993).

As recognized at paragraph 4.1 of the Verified Complaint, under 1 P.R. Laws Ann. § 59, Puerto Rico has two official languages, English and Spanish, both of which "may be used" in official government documents[2].  What the Commission has chosen to do is to use the official language that is understood by the vast majority of the citizenry, a decision that is strengthened by the fact that, other than the two requests by NPP Commissioners referred to in the introductory section of the instant motion, there has never been any complaints from actual voters who were adversely affected by this policy, throughout decades of electoral proceedings. Additionally, the printing of ballots in just one language substantially reduces the expense of ordering over two million ballots for each event.  Whether or not the Court agrees that this is the wisest choice of law, the Spanish-language ballots/instructions certainly pass rational scrutiny.

C) SUBSTANTIVE DUE PROCESS

Plaintiffs then attempt to assert a due process claim, in its substantive modality.  The concept of substantive due process is grounded on the notion that the guarantees embodied in the Fifth and Fourteenth Amendments safeguard more than the right to fair proceedings. Troxel v. Granville, 530 U.S. 57, 65 (2000).  Hence, it is understood that the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests."  Washington v. Glucksberg, 521 U.S. 702, 720

---

[2] Although plaintiffs do not seem to be leaning in that direction, this Honorable Court **is without jurisdiction** (on Eleventh Amendment concerns) to grant any sort of declaratory or injunctive relief demanding compliance with this, or any other item of Puerto Rico law.  See Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 109 (1984) ("It is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.  Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.  We conclude that Young and Edelman are inapplicable in a suit against state officials on the basis of state law."); Díaz-Fonseca v. Puerto Rico, 451 F.3d 13, 42-43 (1st Cir. 2006).

(1997).

Given the extraordinary nature of substantive due process relief, the Supreme Court has expressly warned that:

> Substantive due process has at times been a treacherous field for this Court. There *are* risks when the judicial branch gives enhanced protection to certain substantive liberties without the guidance of the more specific provisions of the Bill of Rights. As the history of the *Lochner* era demonstrates, there is reason for concern lest the only limits to such judicial intervention become the predilections of those who happen at the time to be Members of this Court. That history **counsels caution and restraint**.

Moore v. City of E. Cleveland, 431 U.S. 494, 502 (1977) (emphasis added)

Electoral claims are seldom analyzed under the substantive due process analysis and the First Circuit has counseled against federal intervention under such grounds unless the electoral proceedings are rendered fundamentally unfair.  Bonas v. Town of N. Smithfield, 265 F.3d 69, 74-75 (1st Cir. 2001).  While plaintiffs allege that they are being deprived of the fundamental right to vote, the specific pleadings are at odds the notion that we are indeed before a claim of deprivation of the right to vote.  As stated before, the instant case is about the language in the ballots/instructions, not about the right of access to the polls, **which plaintiffs admit has not been denied to them**.  In other words, we are not before a state-sponsored initiative to preclude non-Spanish speaking voters from casting a vote.

As its stands, the instant action does not raise the deprivation of any liberty interests. The First Circuit has held that "[w]here no protected liberty interest is implicated, substantive due process challenges are viewed under the rational basis standard".  Cook v. Gates, 528 F.3d 42, 49 n. 3 (1st Cir. 2008); Medeiros v. Vincent, 431 F.3d 25, 32-33 (1st Cir. 2005).  As is the case in Equal Protection claims, there is a rational basis (as defined in the applicable jurisprudence) for the action challenged herein.  The same rational-basis analysis stated in the previous section defeats any substantive due process claim and we adopt said arguments for purposes of the instant discussion.

Also relevant is the fact that where, as here, there are state created remedies for the alleged deprivation, a substantive due process claim may not be asserted.  PFZ Properties, Inc. v. Rodríguez, 928 F.2d 28, 31-32 (1st Cir. 1991).  There are several viable alternatives under Puerto Rico law that would resolve plaintiffs' problems.  For instance, Article 5.026 of the Electoral Act, 16 P.R. Laws Ann. § 3229, allows the Commission to enact regulations allowing

voters to be accompanied by someone else to the voting booth.  The Commission may therefore, allow (through regulation) English-speaking voters to take a Spanish-speaking individual of their trust who may clarify any doubts about the ballots/instructions.

There is certainly no basis for a substantive due process claim in the instant case.

**D) PRIVILEGES AND IMMUNITIES**

The next quiver to plaintiffs' bow is an undeveloped challenge under the so-called "Privileges and Immunities Clause".  Article IV, Section 2, Clause 1 of the U.S. Constitution establishes that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."  For over a century it has been understood that this constitutional enactment was designed "to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned."  Paul v. Virginia, 75 U.S. 168, 180 (1869).  Therefore, the Clause establishes "a norm of comity without specifying the particular subjects as to which citizens of one State coming within the jurisdiction of another are guaranteed equality of treatment."  Austin v. New Hampshire, 420 U.S. 656, 660 (1975); see also Toomer v. Witsell, 334 U.S. 385, 395 (1948) (Holding that this Clause was intended to "fuse into one Nation a collection of independent, sovereign States.").  Although this protection was originally designed to regulate the relationship between **states**, it applies to Puerto Rico in all force, either directly or as per 48 U.S.C. § 737, a distinction that is ultimately immaterial.  See Ramos v. P.R. Med. Examining Bd., 491 F. Supp. 2d 238, 243 n. 4 (D.P.R. 2007); DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 37 n. 14 (1st Cir. 2001).

It must be noted that when assessing claims under the Privileges and Immunities clause, the terms "citizenship" and "residency" are construed **to mean the same thing**.  Supreme Court of Virginia v. Friedman, 487 U.S. 59, 64 (1988).

Again, as in prior sections, plaintiffs assert generalized allegation of deprivations of the right to vote, whereas the problem presented is clearly one of the language in the ballots/instructions.

Even then, the instant case is missing the most basic element of any privileges immunities claim, to wit: **residents of one state being treated differently from residents of another state**.  For example, in the hallmark case of Supreme Court of New

Hampshire v. Piper, 470 U.S. 274, 283-284 (1985), the High Court dealt with an attorney who was denied admission to the New Hampshire State Bar because he was a resident of Vermont.   Indeed, in the most recent privileges and immunities decision issued by this Honorable Court, two physicians residing in the State of Florida (represented by the undersigned attorneys) struck, under this constitutional provision, a Puerto Rico statute that required a 6month residency period for the issuance of a license to practice medicine in the Commonwealth.  Ramos, 491 F. Supp.2d at 245.

Plaintiffs do not allege that they are residents of a different state.  Rather, at paragraphs 3.1 and 3.2 of the Verified Complaint, both plaintiffs admit that they have been Puerto Rico residents for years.  While Puerto Rico does not allow non-residents to vote (a restriction which we believe, passes constitutional muster), this is a non-issue in this case.

E) FIRST AMENDMENT

Plaintiffs' final constitutional argument is grounded on the First Amendment.  While the political process does entail the right of freedom of speech (in favor of parties, candidates and causes) and the right of freedom of association (to parties, candidates and causes), none of those rights are implicated in the instant case.

Plaintiffs do not claim that they are being denied the right to campaign or otherwise support/oppose any particular candidate or party.  The same is true of plaintiffs' right to affiliate themselves with any of the four registered parties or with Dr. Rosselló's formal write in movement.

In the absence of any concrete pleadings regarding political speech or associational rights, we cannot address the merits of plaintiffs' First Amendment claims as no such claim has been pled.

F) THE VOTING RIGHTS ACT

Plaintiffs do not seek relief under the Federal Voting Rights Act, 42 U.S.C. § 1973, et seq.  It is axiomatic that in our judicial system, **that which is not pled, is not before the Court.  Even those matters that are pled insufficiently do not warrant judicial consideration**.  See e.g. Castro Ortiz v. Fajardo, 133 F. Supp. 2d 143, 148-149 (D.P.R. 2000) (Explaining how, even under the lax notice pleading standard, the plaintiff is supposed to put some flesh into the bare bones of his argument.  Even though the Court stated in its August 20th

Show Cause Order that it was interested in receiving arguments with regards to this statutory provision, plaintiffs have filed to amend their pleadings to include a claim under the Voting Rights Act (hereinafter referred to as "VRA"), thereby forfeiting any relief thereunder.

Mosts of the decisions that we have been able to gather on this subject deal with whether particular electoral proceedings were subject to the application of the language minorities provisions of the VRA, rather than about whether a particular group was eligible for relief. See e.g. Padilla v. Lever, 463 F.3d 1046 (9th Cir. 2006) (en banc) (holding the statute inapplicable to the California gubernatorial recall process). Nonetheless, our arguments are based on the unambiguous **plain language** of the statute.

In any event, the VRA does not help plaintiffs' cause. Section 203 of the VRA, last amended on July 27, 2006, 42 U.S.C. § 1973aa-1a, deals with "Bilingual Election Requirements". It is worth noting that this statutory provision is inspired in the constitutional guarantees of the Fifth and Fourteenth Amendments, elsewhere invoked in the instant brief. 42 U.S.C. § 1973aa-1a(a). Thus, unless plaintiffs contend that the VRA is unconstitutional, they must agree that their rights are adequately protected by said legislation. For starters, the VRA stems from all-English ballots instructions as a default, seeking to protect non-English speaking minorities. See 42 U.S.C. § 1973aa-1a(e) ("For purposes of this section, the term 'language minorities' or 'language minority group' **means persons who are American Indian, Asian American, Alaskan Natives, or of Spanish heritage**.); 42 U.S.C. § 1973aa-1a(b)(B) ("the term 'limited-English proficient' means **unable to speak or understand English** adequately enough to participate in the electoral process") (emphasis added). The statute does not cover situations where, as here, the default is an all-Spanish ballot with English-speaking minorities seeking protection. Hence, before we begin looking into this statute, plaintiffs must find authority allowing them to read the statute in a way that allows for the substitution of the word "Spanish" for the word "English". We respectfully believe that the Court is **bound** by the definition of "language minorities" chosen by Congress.

There are temporal restrictions that plaintiffs must grapple with before availing themselves to the remedies provided under the VRA. For starters, the statute requires compliance by States and/or political subdivisions thereof by the year **2032**, that is, in more than a quarter century from today and is based on data certified by the **2010** Census, which is

two years down the road.  42 U.S.C. § 1973aa-1a(b)(1) and 1973aa-1a(b)(A).  It is for the plaintiffs to explain why, despite clear statutory language to the contrary, Puerto Rico should be forced to comply with the statute in 2008 and based on data from the 2000 Census.  The Verified Complaint is silent on this matter.

Moreover, the statute requires that in order to qualify for relief, the voting minority prove that, in the jurisdiction where the challenge is being asserted: 1) more than 5 percent of the citizens **of voting age** of such State or political subdivision are members of a single language minority and are limited-English proficient; <u>or</u> 2) more than 10,000 of the citizens **of voting age** of such political subdivision are members of a single language minority and are limited-English proficient; <u>and</u> 3) the **illiteracy rate[3] of the citizens in the language minority as a group is higher than the national illiteracy rate**.  42 U.S.C. § 1973aa-1a(b).  The only demographic figure cited by the plaintiffs (a print-out from the census Bureau's web page) deals with the percentage of the population (14.4%), **5 years or older**, who speak only English.  This figure includes an **undeterminable** number of citizens that **are not of voting age** (i.e., individuals ages 5-17).  Hence, plaintiffs have not established that the have the number necessary to qualify as a language minority under the VRA.  Even if plaintiffs were able to come up with a number in this regard, **they have provided no data whatsoever to establish that their group has an illiteracy rate higher than the U.S. average**.  We doubt that the English-speaking population has a higher illiteracy rate than the United States average.  This omission also proves fatal to plaintiffs' hopes for relief under the VRA.

The VRA therefore presents no impediment to the Commission's conduct, as challenged in the instant action.

**WHEREFORE** it is very respectfully requested from this Honorable Court that the instant action be hereby **DISMISSED**.

### CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that the instant document has been filed with the Court's CM/ECF System, which will simultaneously serve notice on all counsels of record,

---

[3] Defined by Congress as "failure to complete the 5th primary grade."  42 U.S.C. § 1973aa-1a(b)(E).

to their registered e-mail addresses.   Any non-registered attorneys and/or parties will be served via regular mail.

In San Juan, Puerto Rico this 26th day of August, 2008.

**RESPECTFULLY SUBMITTED,**

**LAW OFFICES OF PEDRO ORTIZ ÁLVAREZ, PSC**
P.O. Box 9009
Ponce, Puerto Rico 00732
Tel (787) 841-7575
Fax (787) 841-0000

*S/ Jorge Martínez Luciano*
**JORGE MARTINEZ LUCIANO**
USDC-PR Number 216312
e-mail: squalus@rocketmail.com

*S/ Emil Rodríguez Escudero*
**EMIL RODRÍGUEZ ESCUDERO**
USDC-PR Number 224312
e-mail: emil@poapr.com

*S/ Carmen Edith Torres Rodríguez*
**CARMEN EDITH TORRES RODRÍGUEZ**
USDC-PR Number 222313
e-mail: ctorres@poapr.com