1          UNITED STATES DISTRICT COURT
2            DISTRICT OF PUERTO RICO

3  SYLVIA DIFFENDERFER,
4  et al.,

5       Plaintiffs,                    Civil No. 08-1918 (JAF)

6       v.

7  RAMÓN E. GÓMEZ-COLÓN,
8  et al.,

9       Defendants.

10                    **OPINION AND ORDER**

11       Plaintiffs, Sylvia Diffenderfer and Robert McCarroll, bring this
12  action on behalf of themselves and as representatives of a class of
13  eligible voters in Puerto Rico who do not speak Spanish, against
14  Defendants, Ramón Gómez-Colón, President of the State Electoral
15  Commission of the Commonwealth of Puerto Rico ("SEC"); Gerardo Cruz-
16  Maldonado, Electoral Commissioner of the Popular Democratic Party
17  ("PDP"); Juan Dalmau-Rodríguez, Electoral Commissioner of the Puerto
18  Rican Independence Party ("PIP"); Nelson Rosario-Rodríguez, Electoral
19  Commissioner of the Puerto Ricans for Puerto Rico Party ("PPR"); and
20  Walter Vélez-Rodríguez, Secretary of the SEC, challenging Puerto
21  Rico's Spanish-only ballot system.  Docket No. 1.  In addition to
22  monetary damages and attorneys' fees, Plaintiffs seek an injunction
23  requiring the Commonwealth of Puerto Rico to print ballots for the
24  2008 elections in both English and Spanish.  Id.

25       For the reasons stated below, we find in Plaintiff's favor and
26  grant injunctive relief as requested.

27                            **I.**

1        **Factual and Procedural History**

2        Unless otherwise noted, we derive the following factual summary

3   from the pleadings, motions, and exhibits, <u>Docket Nos. 1, 18, 19, 21,</u>

4   <u>25, 26, 39</u>, and from the facts developed at the show-cause hearing,

5   <u>Docket No. 44</u>.[1]

6        According to the 2000 national census, 14.4 percent of Puerto

7   Rico residents over age five speak only English.[2]   Nevertheless,

8   ballots for Commonwealth elections are and always have been printed

9   in Spanish only, with three general exceptions.[3]

10       Lead Plaintiffs are two residents of the Commonwealth of Puerto

11  Rico who cannot speak, understand, read or write in Spanish.

12  Diffenderfer is a United States citizen and resident of Gurabo who

13  has lived in Puerto Rico for the past fourteen years.   She has not

14  registered to vote or attempted to vote in previous elections because

15  she felt that she would be unable to fill out the ballot correctly,

16  since she does not read or understand Spanish.      However, she

---

[1] At the hearing, surprisingly, the SEC Defendants did not testify. Instead, Defendants presented only the testimony of two lower-level employees, José Torres and Juan Colón Berlingeri, and contractor Ángel Figueroa. Defendants did not give us the benefit of any other input that would provide us with a broader factual perspective on the controversy.

[2] The 2000 national census data was appended to the complaint. <u>Docket No. 1</u>. The parties did not challenge the accuracy of the census information. The 14.4 percent of Puerto Rican monolingual English speakers is 506,661. Of that population, approximately 71.4 percent are over the voting age of eighteen, meaning the number of affected voters is approximately 362,000. This court can take judicial notice of published census data. However, since the parties clearly accepted the 2000 census information, we omit any legal analysis on judicial notice.

[3] In at least three previous elections, the New Progressive Party ("NPP") primaries in 2003 and 2008 and the presidential primary in 2008, the Commonwealth has had bilingual ballots.

Civil No. 08-1918 (JAF)                                              -3-

1    registered to vote in the November 2008 election because she had
2    heard that the ballots would be bilingual.  McCarroll is a United
3    States citizen and resident of Carolina who has lived in Puerto Rico
4    for the past fifteen years.  He registered to vote in Puerto Rico
5    prior to the 2004 election and attempted to vote in 2004 but found
6    the ballots to be confusing.  Plaintiffs McCarroll and Diffenderfer
7    seek to represent all persons in Puerto Rico who speak, understand,
8    read, and write in English, but not in Spanish.

9         Defendants are members of the SEC, which is composed of a
10   chairman and four electoral commissioners.  16 L.P.R.A. § 3004 (2000
11   & Supp. 2005).  Each electoral commissioner represents one of the
12   four political parties registered with the SEC.[4]  Id.  Election
13   regulations must be agreed upon by a unanimous vote of the
14   commissioners; absent a unanimous decision, the chairman alone
15   determines official policy on the matter.  16 L.P.R.A. § 3214 (2000).

16        At an SEC meeting on April 16, 2008, José Enríquez Meléndez
17   Ortiz ("Meléndez"), alternate commissioner for the NPP, proposed that
18   ballots be printed in both Spanish and English.  The commissioner for
19   the NPP stated that he was in favor of bilingual ballots, while the
20   commissioner for the PIP opposed them.  The commissioners for the PDP
21   and the PPR both stated that they would let the SEC know the
22   positions of their parties at a later date.  The SEC chairman decided
23   to table the issue until the second week of May 2008.  However, the
24   SEC never discussed bilingual ballots again.

_____

[4] These parties are the NPP, the PDP, the PIP, and the PPR.

1        Over the next several months, Meléndez repeatedly asked the SEC
2   secretary whether the chairman had made a determination as to whether
3   ballot materials would be printed in both English and Spanish.   The
4   secretary repeatedly responded that there had been no resolution.   On
5   July 31, 2008, the chairman issued a one-page resolution denying the
6   request for bilingual ballots.   Pls.' Ex. 2.   The resolution adopted
7   a 2004 resolution determining that the Voting Rights Act, 42 U.S.C.
8   §§ 1973 to 1973aa-6, did not apply to Puerto Rico.   Pls.' Ex. 3.

9        On August 19, 2008, Plaintiffs filed the present complaint in
10  federal district court, requesting declaratory and injunctive relief,
11  nominal damages, and attorneys' fees.   Docket No. 1.   On August 26,
12  2008, Defendant Gómez-Colón filed a brief, Docket No. 18, and
13  Defendant Cruz-Maldonado filed a motion to dismiss, Docket No. 20,
14  and a motion opposing class certification, Docket No. 26.   On the
15  same day, Defendant Rosario-Rodríguez filed an answer and a
16  memorandum of law urging us to grant the injunctive relief requested
17  by Plaintiffs.   Docket Nos. 19, 21.   Also on the same day, Plaintiffs
18  filed a brief.   Docket No. 25.   On August 27, 2008, we held a show-
19  cause hearing as to why we should not grant the injunctive relief
20  requested by Plaintiffs.   Docket No. 33.

21       In its pre-hearing brief and initially during the show-cause
22  hearing, Defendants sought to establish that it would be impossible
23  to print bilingual ballots in time for the November 2008 election.[5]
24  However, Defendants failed to introduce any authoritative testimony

---

     [5] Puerto Rico law requires that the SEC begin printing ballots
fifty-five days before the election.   16 L.P.R.A. § 3210 (2000).
This year, that corresponds to September 10, 2008.

1   to this effect.   Despite Defendants' avoidance of the matter, we

2   insisted on hearing the testimony of Ángel Figueroa, the manager of

3   the printing company that has been contracted to print the 2008

4   ballots.   Figueroa testified that he could print bilingual ballots in

5   time, at an additional cost.   On August 29, 2008, Plaintiffs

6   submitted a letter from Figueroa stating that the increase in cost

7   would be $26,472.00.[6]   <u>Docket No. 39</u>.

8                                    **II.**

9                                 <u>**Analysis**</u>

10  **A.   <u>Jurisdiction and Trial on the Merits</u>**

11       This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

12  Under <u>Ex Parte Young</u>, 209 U.S. 123 (1908), we may grant prospective

13  injunctive relief to prevent a continuing violation of federal law.

14  Although Plaintiffs were not parties before the SEC, and never sought

15  state court review, there is no exhaustion requirement to their

16  claims.

17       In our Order to Show Cause, <u>Docket No. 5</u>, we stated that we

18  expected to hear and receive all the available testimonial and

19  documentary evidence, including any relevant testimony by Defendants.

20  At the conclusion of the hearing, the parties did not object to our

21  statement that they had presented all evidence relevant to the issues

22  at bar.   Therefore, there is no impediment to treating this matter as

23  a trial on the merits under Federal Rule of Civil Procedure 65(a)(2).

---

[6] This submission was in direct response to our statement during the hearing that Figueroa must file a price quotation in court. We also stated that Defendants could comment on the price quote. To this date, Defendants have not objected to Figueroa's submission.

Civil No. 08-1918 (JAF)                                                    -6-

1    **B.    <u>Class Certification</u>**

2         Plaintiffs request class certification under Federal Rule of

3    Civil Procedure 23.  <u>Docket No. 1</u>.  Only Defendant Cruz-Maldonaldo

4    opposes.  <u>Docket No. 26</u>.

5         Rule 23 provides that we may certify a class if: "(1) the class

6    is so numerous that joinder of all members is impracticable; (2)

7    there are questions of law or fact common to the class; (3) the

8    claims or defenses of the representative parties are typical of the

9    claims or defenses of the class; and (4) the representative parties

10   will adequately protect the interests of the class." Fed. R. Civ. P.

11   23(a).

12        The class of monolingual English speakers eligible to vote in

13   Puerto Rico is numerous enough that joinder of all members is

14   impracticable.  All members of this class are, by definition, unable

15   to vote using a Spanish-only ballot without some assistance.  All

16   therefore possess a common legal claim for the right to use bilingual

17   ballots.  The representative Plaintiffs, Diffenderfer and McCarroll,

18   appear to have typical constitutional claims.  Finally, they both

19   testified that they would pursue the legal action to its conclusion;

20   therefore, we find that they will adequately protect the interests of

21   the class.  None of Cruz-Maldonado's arguments convince us otherwise.

22   See <u>Docket No. 26</u>.

23        Accordingly, we certify this case as a class action.

24   **C.    <u>Statute of Limitations</u>**

25        Defendants argue that Plaintiffs' claims are barred by Puerto

26   Rico's one-year statute of limitations because Plaintiffs have lived

27   in Puerto Rico for several election cycles and have not challenged

Civil No. 08-1918 (JAF)                                          -7-

1   Puerto Rico's Spanish-only ballot system.  Docket No. 20; see Morales

2   Tañon v. P.R. Elec. Power Auth., 524 F.3d 15, 18 (1st Cir. 2008)

3   (applying one-year statute of limitations to § 1983 claims).

4   However, "[t]he continued enforcement of an unconstitutional statute

5   cannot be insulated by the statute of limitations." Kuhnle Bros.,

6   Inc. v. County of Geauga, 103 F.3d 516, 522 (6th Cir. 1997) (quoting

7   Va. Hosp. Ass'n v. Baliles, 868 F.2d 653, 663 (4th Cir. 1989))

8   (internal quotation marks omitted).  Accordingly, Plaintiffs' claims

9   for injunctive relief are not time-barred.

10  **D.   Merits of Federal Claims**

11       Plaintiffs raise a number of arguments against Puerto Rico's

12  Spanish-only ballot system.  Because we find that the Spanish-only

13  ballots violate the Voting Rights Act, the Equal Protection Clause,

14  and the First Amendment, we grant the injunctive relief requested,

15  for the reasons stated below.

16       **1.   Voting Rights Act**

17       The application of the Voting Rights Act ("VRA") is a matter of

18  first impression in a mainly Spanish-speaking jurisdiction like

19  Puerto Rico.  Section 2 of the VRA prohibits any state or political

20  subdivision from imposing any "standard, practice, or procedure" that

21  "results in a denial or abridgement of the right of any citizen of

22  the United States to vote" on the basis of race, color, or membership

23  in a language minority group.  42 U.S.C. §§ 1973(a), 1973b(f)(2).

24  Originally, the VRA applied only to practices that discriminated on

25  the basis of race; however, in 1975 Congress extended the VRA to

26  members of certain language minorities.  Pub. L. No. 94-73, 89 Stat.

27  400 (1975).  After the Supreme Court held that § 2 required a

1   plaintiff to show an intent to discriminate, <u>Mobile v. Bolden</u>, 446

2   U.S. 55, 64 (1980), Congress further amended the section to prohibit

3   any denial or abridgement of voting rights on account of race or

4   language minority status without regard to discriminatory intent.

5   Pub. L. No. 97-205, 96 Stat. 131 (1982); <u>Hernández v. Woodard</u>, 714 F.

6   Supp. 963, 967 (N.D. Ill. 1989) (citing <u>Thornburg v. Gingles</u>, 478

7   U.S. 30 (1986)).

8        Section 2 is intended to ensure that voters in the classes

9   protected by the VRA are "free from any election practice 'which

10  operates, designedly or otherwise' to deny them the same opportunity

11  to participate in all phases of the political process as other

12  citizens." <u>United States v. Berks County</u>, 277 F. Supp. 2d 570, 580

13  (E.D. Pa. 2003) (quoting S. Rep. No. 97-417, at 28 (1982)).  The

14  voting rights protected by § 2 are expansive; the section includes

15  protection for "all action necessary to make a vote effective,"

16  including "casting a ballot and having such ballot counted properly."

17  42 U.S.C. § 1973*l*(c)(1).   To establish a violation of § 2, a

18  plaintiff must show that, based on the totality of the circumstances,

19  the use of a "contested electoral practice . . . results in members

20  of a protected group having less opportunity than other members of

21  the electorate to participate in the political process and to elect

22  representatives of their choice." <u>Gingles</u>, 478 U.S. at 63; <u>accord</u> 42

23  U.S.C. § 1973(b).

24       In addition to the general prohibitions of § 2, § 4 of the VRA

25  specifically forbids certain "covered" jurisdictions from denying any

26  citizen the right to vote due to his or her failure to comply with

27  any "test or device" employed in the electoral process.  42 U.S.C. §

1   1973b.  The 1975 amendments expanded the term "test or device" to
2   include "any practice or requirement by which any State or political
3   subdivision provide[s] any [election-related materials], including
4   ballots, only in the English language."  § 1973b(f)(3).  Section 4
5   requires a jurisdiction to provide election-related materials,
6   including ballots, in both English and the language of a language
7   minority group if (1) more than five percent of voting-age citizens
8   are members of that language minority, (2) the Attorney General found
9   that the jurisdiction employed any test or device in the 1972
10  election, and (3) less than fifty percent of voting-age citizens were
11  registered or actually voted in the 1972 election.  § 1973b(b),
12  (f)(3)-(4).

13      By its explicit terms, the VRA appears difficult to apply in
14  this context.  We cannot apply the requirements of § 4 because the
15  Attorney General has made no findings with regards to whether Puerto
16  Rico employed any test or device as a prerequisite to voting in its
17  1972 elections; thus, Puerto Rico is not a covered jurisdiction.
18  Moreover, that section specifically refers to elections conducted
19  only in English, while it is a Spanish-only ballot at issue here.
20  Section 2 may be similarly technically inapplicable because the VRA
21  defines "language minority" as encompassing only groups of Asian
22  American, American Indian, Alaskan Native, or Spanish heritage.  42
23  U.S.C. § 1973*l*(c)(3).[7]

---

[7] There are still more sections of the VRA that would apply here
but for Congress' focus on "English-only," rather than language
majority-only, elections.  <u>See, e.g.</u>, 42 U.S.C. § 1973aa-1a
(requiring bilingual ballots where there is a single language
minority that is not English proficient and has an illiteracy rate

1        Congress enacted the VRA in the context of the continental

2   United States, a society where the predominant language is English.

3   In Puerto Rico, an officially bilingual jurisdiction and a

4   traditionally Spanish-speaking society, it is English-monolingual

5   individuals who are in the minority.  See Smothers v. Benitez, 806 F.

6   Supp. 299, 304 (D.P.R. 1992).  The VRA does not by its terms

7   contemplate such a situation.  However, in another context, the

8   Supreme Court has emphasized that the VRA "should be interpreted in

9   a manner that provides 'the broadest possible scope'" in combating

10  discrimination.  Chisom v. Roemer, 501 U.S. 380, 403 (1991) (quoting

11  Allen v. State Bd. of Elections, 393 U.S. 544 (1969)).  "Moreover,

_____

higher than the national rate of illiteracy).  Of particular interest
is § 4(e), which prohibits conditioning voting on the ability to
read, write, speak, or understand English for individuals educated in
any state, territory, the District of Columbia, or Puerto Rico in a
school where the predominant classroom language is other than
English.  42 U.S.C. § 1973b(e).  According to its main sponsor, the
purpose of § 4(e) "was to bring the citizen of 'Puerto Rican origin
into a status of equality with his fellow citizens.'"  Berks County,
277 F. Supp. 2d at 579 (quoting 111 Cong. Rec. 11160 (1965)
(statement of Sen. Kennedy)).  Section 4(e) has been interpreted
broadly to prohibit English-only elections.  Id. (citing cases).
Section 4(e) provides additional protection to individuals educated
in Puerto Rico in non-English-based schools who are literate but who
do not speak English. § 1973b(e).  In the present instance, we find
ourselves in the inverse situation.  Plaintiffs are not required to
speak Spanish to be citizens of Puerto Rico; in fact, like Puerto
Ricans, they may migrate freely between the mainland United States
and the Commonwealth of Puerto Rico.  However, they cannot take
advantage of the VRA provisions providing for bilingual ballots
because the English-speaking community in Puerto Rico is not
illiterate and because Puerto Rico is not a "covered" jurisdiction.
Although § 4(e) does not by its terms apply to Plaintiffs, they
should be able to exercise their right to vote in Puerto Rico on
equal par with persons born and raised on the island, in the same way
that Puerto Ricans who migrate to the mainland United States are
granted protections to ensure that they can exercise their right to
vote there.

1    claims under the [VRA] require 'an intensely local appraisal of the
2    design and impact' of the challenged electoral practice." Stewart v.
3    Blackwell, 444 F.3d 843, 878 (6th Cir. 2006) (quoting Gingles, 478
4    U.S. at 78). Accordingly, we find it appropriate to look to the
5    spirit and intent of the law: eliminating discrimination on the basis
6    of race or language minority status in voting.  See South Carolina v.
7    Katzenbach, 383 U.S. 301, 315 (1966).

8          The result of a Spanish-only ballot in Puerto Rico is to
9    discriminate against Plaintiffs, both on the basis of their status as
10   a language minority and their race, in the exercise of their right to
11   vote.  Although the VRA limits the definition of "language minority"
12   to four groups, we find it appropriate in this context, clearly not
13   contemplated by Congress, to include the English-monolingual
14   community in Puerto Rico as a language minority group in order to
15   best implement the intent of the VRA.  Furthermore, in accordance
16   with our analysis under the Equal Protection Clause, infra, we find
17   that a Spanish-only ballot system discriminates against Plaintiffs on
18   the basis of their national origin, ethnicity, and/or race.
19   Accordingly, we find that Defendants, by providing ballots only in
20   Spanish, are in violation of § 2 of the VRA.  In the alternative,
21   even if the VRA is inapplicable ex propio vigore, because the VRA
22   protects rights that are similarly safeguarded by the Equal
23   Protection clause, our VRA analysis also supports a finding that a
24   Spanish-only ballot violates the Equal Protection Clause.

25         **2.   Equal Protection Clause**

1       Plaintiffs assert that a Spanish-only ballot system violates the

2   Equal Protection Clause of the Fourteenth Amendment to the United

3   States Constitution.   Docket No. 1.

4       **a.   Equal Protection Standard**

5       The Equal Protection Clause of the Fourteenth Amendment

6   originated in the post-Civil War era when Congress purposely intended

7   to resolve lingering racial inequalities from disparate application

8   of state laws; it is an instrument by which the federal government

9   may correct official discrimination at the state, commonwealth, or

10  territorial level.   Yick Wo v. Hopkins, 118 U.S. 356, 369-71 (1886)

11  (opining that the Fourteenth Amendment guarantees equal enjoyment of

12  fundamental liberties and privileges, including the franchise, which

13  is the foundation to all civil rights); see also Harper v. Va. Bd. of

14  Elections, 383 U.S. 663, 665-67 (1966) (invalidating a poll tax as a

15  discriminatory test for wealth which is irrelevant to protecting the

16  integrity of elections).   "These provisions are universal in their

17  application, to all persons within the territorial jurisdiction,

18  without regard to any differences of race, of color, or of

19  nationality; and the equal protection of the laws is a pledge of the

20  protection of equal laws."   Yick Wo, 118 U.S. at 369.

21      Under the Equal Protection Clause, racial classifications must

22  be analyzed under strict scrutiny, meaning they must be narrowly

23  tailored to further a compelling government interest.   Johnson v.

24  California, 543 U.S. 499, 505 (2005) (citing Adarand Constructors,

25  Inc. v. Peña, 515 U.S. 200, 227 (1995)).   By contast analyze

26  regulations that do not classify by race or otherwise burden a

27  suspect class or fundamental right under the rational basis test,

1   requiring only that the regulation be "rationally related to a
2   legitimate state interest." Pennell v. City of San Jose, 485 U.S. 1,
3   14 (1988).  We find that the Spanish-only ballot system in Puerto
4   Rico does not survive either level of review.

5        First, we analyze the election regulation under strict scrutiny.
6   Typically, when a statute burdens one race more than another, but
7   does not make an explicit racial classification, a plaintiff must
8   prove the existence of a discriminatory purpose.  Washington v.
9   Davis, 426 U.S. 229, 239 (1976).  However, in voting rights cases,
10  because of the fundamental importance of the right to vote, courts
11  may apply strict scrutiny without a showing of intentional
12  discrimination.  Coal. for Educ. in Dist. One v. Bd. of Elections of
13  the City of N.Y., 370 F. Supp. 42, 55 (S.D.N.Y. 1974) (finding
14  discriminatory practices against black, Puerto Rican, and Chinese
15  voters in New York without further inquiry into motives), aff'd, 495
16  F.2d 1090, 1092 (2d Cir. 1974).

17       Historically, the status of English in Puerto Rico has been a
18  highly divisive subject, largely due to significant anti-American
19  sentiment.  See Dimarco Zappa v. Rivera Cruz, 30 F. Supp. 2d 123,
20  129-30 (D.P.R. 1998) (explaining that differences over Puerto Rico's
21  status vis-a-vis the United States "set[] apart both United States
22  citizens born or residing in Puerto Rico and those born or residing
23  in the other states of the Union"); Smothers, 806 F. Supp. at 304
24  (characterizing the debate over whether to include English as an

1    official language in Puerto Rico as fueled by anti-Americanism).[8]

2    Given this background, the SEC's refusal to print bilingual ballots

3    invites the strong inference that discrimination against English

4    speakers is at play.  While groups of people who share a linguistic

5    background do not always correspond to any definite racial or ethnic

6    group, this case implicates the electoral rights of English speakers

7    in a predominantly Spanish-speaking jurisdiction.  In Puerto Rico,

8    use of English is frequently identified with natives of the

9    continental United States, as a distinct national category apart from

10   native-born Puerto Ricans, for whom Spanish remains their mother

11   tongue.  See Dimarco Zappa, 30 F. Supp. 2d at 129-30; Smothers, 806

12   F. Supp. at 304.

13       Thus, in the context of the Commonwealth of Puerto Rico,

14   membership in a linguistic group is essentially identical to a

15   national, ethnic, or even racial classification.  Because the policy

16   burdens the rights of monolingual English speakers to vote on the

17   basis of their nationality and/or race, strict scrutiny is

18   appropriate.  See Coal. for Educ., 370 F. Supp. at 55.

19       The Spanish-only ballot system clearly does not withstand strict

20   scrutiny.  Defendants have proposed no compelling interests which

21   Spanish-only elections serve to protect.  By placing Plaintiffs at

_____

[8]For the period 1902 to 1991, English and Spanish were the official
languages in Puerto Rico.  1 L.P.R.A. §§ 51-55 (1982).  From 1991 to 1993,
the defenders of Spanish-only were able to enact legislation making Spanish
the only official language.  1 L.P.R.A. §§ 56-58 (Supp. 1992).  In 1993,
the 1991 Spanish-only legislation was repealed and English and Spanish
became the official languages once again.  1 L.P.R.A. §§ 59-60 (1999).

1    special risk of casting void ballots,[9] Defendants have frustrated the

2    basic democratic precept that each voter should have equal voice in

3    the  electoral  process.    In  upholding  the  franchise  of  English

4    speakers in Puerto Rico, we confirm that the Equal Protection Clause

5    protects all citizens of the United States without distinctions as to

6    culture or geography.

7         Even  if  we  apply  only  rational  basis  review,  the  Spanish-only

8    ballot  system  cannot  survive.    Although  the  rational  basis  test  is

9    deferential  to  the  government,  it  does  not  blindly  condone  all

10   governmental  classifications.    See, e.g., Romer v. Evans, 517 U.S.

11   620, 632 (1996) (invalidating under rational review state provision

12   prohibiting  actions  designed  to  protect  homosexual  persons  from

13   discrimination); City of Cleburne v. Cleburne Living Ctr. Inc., 473

14   U.S. 432, 450 (1985) (invalidating zoning ordinance excluding group

15   homes for the mentally retarded); U.S. Dep't of Agric. v. Moreno, 413

16   U.S.  528,  533  (1973)  (enjoining  enforcement  of  amendment  to  Food

17   Stamp  Act  rendering  ineligible  households  containing  one  or  more

18   unrelated persons).

19        The  only  claimed  legitimate  reason  to  maintain  a  Spanish-only

20   ballot  system  is  Defendants'  suggestion  that  bilingual  ballots  are

21   impracticable.    The  sole  basis  on  which  Defendants  rely  is  the

22   supposed impossibility of printing ballots on certain paper stock in

23   time  for  the  general  elections  this  November.    At  the  show-cause

_____

[9]Given  the  current  state  of  the  ballot  instructions,  even  Spanish-
speaking voters  are  at  risk  of  casting  void  ballots.  See Puerto Rico
E l e c t i o n   C o m m i s s i o n ,   G e n e r a l   E l e c t i o n s   2 0 0 4 ,
http://cee.ceepur.org/principal.aspx?Nivel=P1 (last visited Sept. 1, 2008);
see also  discussion  infra regarding ballot confusion, Part II.3 and note
8.

1   hearing, Ángel Figueroa, the contracted printer, stated unequivocally

2   that printing would be possible on the specified paper stock provided

3   that the ballots are expanded along only one dimension (height), and

4   that he should have enough paper stock in reserve to meet the

5   requirements of the proposed ballot submitted by Plaintiffs.  In a

6   later submission, requested by the court during the hearing, Mr.

7   Figueroa anticipated heightened labor costs by $26,500 due to the

8   adjustments, without need for additional paper.  <u>Docket No. 39-2</u>.

9   However, even if the current paper stock in supply cannot meet the

10  requirements to run bilingual ballots, we see no credible reason why

11  other paper stock may not be obtained in time to print.

12        Accordingly, we find that the Spanish-only policy fails under

13  either strict scrutiny or rational basis review.  Plaintiffs' Equal

14  Protection rights are violated by a policy that hinders monolingual

15  English speakers in casting effective votes.

16        **b.**   **<u>Cultural Nationalism: The Silent Discriminatory Motive</u>**

17        According to our experience as a federal judge, born, raised,

18  and educated in Puerto Rico, we find that the only logical

19  explanation for Defendants' position against a bilingual ballot is a

20  disguised form of discrimination rooted in cultural nationalism.

21  Since 1898, Puerto Ricans have responded to the island's territorial

22  relationship with the United States by espousing a form of  cultural

23  nationalism.  All political factions have always believed that Puerto

24  Ricans have a shared culture and language that must be respected and

25  preserved, but also brings about in the daily lives of our

26  communities the kind of discriminatory undercurrent found in this

27  case.  At odds with this notion is the fact that today, Puerto Rican

1    society is undeniably nationally, ethnically, and linguistically

2    diverse.  According to the 2000 census, hundreds of thousands of

3    people residing in Puerto Rico were born in the continental United

4    States, many were born in United States Island Areas, and a large

5    group were born abroad to American parent(s).  There are also

6    thousands of residents who are foreign-born. In addition, 14.4

7    percent of the island's total population speaks only English at home.

8    Among these are millions of people in the island and in the mainland

9    United States that self-identify as Puerto Rican who are either

10   English-monolinguals, bilingual English and Spanish speakers, or code

11   switchers of both languages.  Language is no longer the sole

12   determinant of a Puerto Rican national identity. See generally Jorge

13   Duany, The Puerto Rican Nation on the Move: Identities on the Island

14   and in the United States (2001); Juan Flores, Divided Borders: Essays

15   on Puerto Rican Identity (1993).

16       Cultural nationalism — whether in Puerto Rico or the continental

17   United States — must be reconciled with the fact that we live in a

18   democratic system of governance that is deeply pluralist at its core.

19   As James Madison argued, "measures are too often decided, not

20   according to the rules of justice and the rights of the minor party,

21   but by the superior force of an interested and overbearing majority."

22   The Federalist No. 10 (James Madison).  Federalists like Madison

23   imagined a federal republican state that safeguarded  individual

24   liberty from majority rule.  In Federalist No. 51, Madison wrote: "It

25   is of great importance in a republic not only to guard the society

1    against the oppression of its rulers but to guard one part of the

2    society against the injustice of the other part.  If a majority be

3    united by a common interest, the rights of the minority will be

4    insecure."  Just as English-only initiatives in the continental

5    United States are driven by nativist fears and prejudices, Puerto

6    Rico's Spanish-only system grows from impermissible nationalist

7    drives.  See Kenya Hart, Defending a "Death by English": English-

8    Only, Spanish-Only, and a Gringa's Suggestions for Community Support

9    of Language Rights, 14 Berkeley La Raza L.J. 177, 180 (2003).

10         Today, we take a modest step to curb an impermissible reliance

11   on cultural nationalism that has the effect of preventing English-

12   speaking residents of Puerto Rico from exercising a meaningful right

13   to vote on equal footing with the Spanish-speaking population of the

14   island.

15         **3.  First Amendment**

16         Plaintiffs assert that the Spanish-only ballot system denies

17   them their First Amendment right to free expression.  Docket No. 1.

18         "The right to vote derives from the right of association that is

19   at the core of the First Amendment." Storer v. Brown, 415 U.S. 724,

20   756 (1974) (Brennan, J., dissenting).  In evaluating a First

21   Amendment challenge to a state election regulation, we must consider

22   the character of the First Amendment rights at stake, and identify

23   and evaluate the interests put forward by the state as justifications

24   for the rule.  Anderson v. Celebrezze, 460 U.S. 780, 789 (1983)

1    (invalidating state provision imposing early filing deadline on

2    presidential candidates); Crawford v. Marion County Election Bd., __

3    U.S. __, 128 S. Ct. 1610, 1616 (2008) (plurality opinion) (applying

4    Anderson balancing test to voter eligibility requirement).  We must

5    determine "the legitimacy and strength" of each interest the state

6    proffers, and "consider the extent to which those interests make it

7    necessary to burden the plaintiff's rights."  Anderson, 460 U.S. at

8    789.  The First Circuit has held that "federal intervention into a

9    state election was appropriate where a significant percentage of the

10   qualified and voting electorate was, in effect, denied its vote."

11   Rosselló-González v. Calderón-Serra, 398 F.3d 1, 16 (1st Cir. 2004)

12   (citing Griffin v. Burns, 570 F.2d 1065, 1078-79 (1st Cir. 1978)).

13       We begin by examining the First Amendment interests at stake.

14   The Puerto Rico ballot is complex and difficult to understand.  There

15   are four different ways a voter can vote: a "straight vote," or a

16   vote for all the candidates of a particular party; a "mixed vote," or

17   a vote for the party of choice but with exceptions for some

18   individual candidates from other parties; a "candidate vote," or a

19   vote for candidates for each office, without selecting a party; and

20   a write-in vote.  Each of these methods has its own procedure for

21   marking the ballot, and the distinctions are not obvious when looking

22   at the grid in which a voter must mark his or her choices.[10]   There

_____

[10] Indeed, the Puerto Rican ballot may create confusion for Spanish speakers as well.  See Rosselló-González, 398 F.3d at 4-7 (describing dispute over how to tally votes in Puerto Rico's 2004 general election).

1    are over 200 words in the Spanish-language instructions for the

2    legislative electoral ballot.[11]  Moreover, there are three ballots in

---

[11] Plaintiffs submitted, as Exhibit 6C, an English translation of the Spanish instructions for the legislative electoral ballot.  We produce these instructions below, as written by Plaintiffs.

    INSTRUCTIONS ON HOW TO CAST A VOTE ON THE LEGISLATIVE ELECTORAL BALLOT
    On this ballot, you have the right to vote for five (5) legislator candidates as it follows: Only one (1) candidate for Representative for District; two (2) candidates for Senators for District; only one (1) candidate for Representative at Large; one (1) candidate for Senator at Large.
    HOW TO CAST A DIRECT VOTE?
    To cast a direct vote, you only make a valid mark (X) in the provided blank under the insignia of the party of your choice and don't make any other mark on the ballot.  This only mark will valid all the Legislators candidates that you have the right to vote for in this ballot.  In the case for Representatives and Senators at Large, the direct vote will be accumulated in each precinct, only the candidate that's in first position in the column under the party that has been voted for the Representative in the position number 4 and the position number 10.
    HOW TO CAST A MIXED VOTE?
    To cast a mixed vote, make a valid mark (X) under the insignia of the party of your choice and next to one or more candidates outside the column of your party, or write the name of the person of your choice in the last column of Direct Nomination (Write-In).  Have in mind that you can't vote for more candidates than the total indicated before.  (No more than one Representative for District; nor more than two Senators for District; no more than one Representative at Large; no more than one Senator at Large).  It'll also become a mixed ballot, when you mark other candidates for Representatives or Senators at Large under the same column of your party that's different to the candidate in position 4 or in position number 10.  When you vote Mixed, the vote that earns this different candidate, will lose it the candidate in the same position of the party for which you have voted for.
    HOW TO CAST A CANDIDATURE VOTE?
    When the voter has no intention to vote under the insignia of any party, and wants to vote exclusively for one or more candidates, he/she will make one valid mark (X) next to the candidate or candidates of your choice, or by write the name of other persons of these choice that are not candidates under the corresponding candidature in the Direct Nomination (Write-In) column.
    HOW TO CAST A VOTE FOR INDEPENDENT CANDIDATURE?
    The voter interested to vote exclusively for one or more Independent candidates can make a valid mark (X) inside the provided box named "Independent candidates".  This only mark will valid all the Independent candidates in this column.

1    total - one for the governor and resident commissioner, one for the
2    state legislature, and one for the municipal legislatures - each of
3    which offers different numbers of potential selections and each of
4    which contains a different set of instructions.   Requiring non-
5    Spanish speakers to navigate these ballots entirely in Spanish
6    effectively limits the political participation of a significant
7    percentage of Puerto Rico's eligible voters.   See Griffin, 570 F.2d
8    at 1078-79 (finding constitutional violation where voting regulation
9    invalidated votes of a discrete group of voters constituting
10   approximately ten percent of qualified and voting electorate).

11       Next, we consider the legitimacy of Defendants' asserted
12   interests, and the extent to which these interests require
13   limitations on Plaintiffs' First Amendment rights.   We emphasize that
14   here, unlike in rational basis review, we examine "the precise
15   interest put forward by the [Commonwealth]."   Anderson, 460 U.S. at
16   789.   As noted supra, the only reasons asserted by Defendants to
17   justify their use of Spanish-only ballots are that printing bilingual
18   ballots will cost more money and may be difficult to accomplish at
19   this late date.   See Docket No. 18.   The second reason was belied by
20   printer Ángel Figueroa's testimony at the show-cause hearing that it
21   would be possible to print the ballots on time.   The increase in cost

---

We note that this is only one set of instructions out of the three
different ballots, each of which is distinct.

Civil No. 08-1918 (JAF)                                              -22-

1    alone does not justify a substantial burden on Plaintiffs' First

2    Amendment right to express themselves by voting.

3        Accordingly, we find that Defendant's Spanish-only ballots

4    violate the First Amendment.

5                                    **III.**

6                                 **<u>Conclusion</u>**

7        In accordance with the foregoing, we **GRANT** the injunctive relief

8    sought by Plaintiff, <u>Docket No. 1</u>.  We hereby endorse our oral order

9    announced at the conclusion of the hearing that Defendants take all

10   necessary steps to print the three types of ballots in Spanish and in

11   English along the lines proposed by Plaintiffs in the model bilingual

12   ballots that appeared in evidence as exhibits 6A, 6B, and 6C, of

13   which official translations will be filed during the course of the

14   day.  No damages will be awarded.  We award costs and attorneys' fees

15   to Plaintiffs.

16       **IT IS SO ORDERED.**

17       San Juan, Puerto Rico, this 2nd day of September, 2008.

18                              S/José Antonio Fusté
19                              JOSE ANTONIO FUSTE
20                              Chief U.S. District Judge